Todd J. Dressel (SBN 220812)
CHAPMAN AND CUTLER LLP
595 Market Street, 26th Floor
San Francisco, CA  94105
Telephone:     (415) 278-9088
Facsimile:      (415) 541-0506
dressel@chapman.com

Robert Schneider (*Admitted Pro Hac Vice*)
James Heiser (*Pro Hac Vice Application Pending*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL  60603
Telephone:     (312) 845-3000
Facsimile:      (312) 516-1900
bschneid@chapman.com
heiser@chapman.com

Attorneys for Integrated Global Concepts, Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| INTEGRATED GLOBAL CONCEPTS, INC., <br><br> Plaintiff <br><br> v. <br><br> J2 GLOBAL, INC. AND ADVANCED MESSAGING TECHNOLOGIES, INC., <br><br> Defendants. | Case No. 12-CV-0343 RMW <br><br> **RESPONSE TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE** <br><br><br> Date:   October 26, 2012 <br> Time:  9:00 a.m. <br> Place:  Courtroom 6 |

**TABLE OF CONTENTS**

SECTION                              HEADING                                      PAGE

SUMMARY ..................................................................................................1

BACKGROUND ............................................................................................3

I.     THE TIMELINE OF EVENTS GIVING RISE TO IGC'S COMPLAINT ................................4

       A.     April 1997-November 1998: j2 Files Patent Applications
              with the USPTO Claiming the Invention Which Is the
              Subject of the Patent Claims for the '638 and '688 Patents,
              Which Are the Subject of the Infringement Action ....................4

       B.     September-November 1998: IGC Develops the Software,
              Equipment and Other Assets to Launch the eFax Service .........4

       C.     Spring-Summer 2000: j2 Enters into Merger Discussions
              with eFax and Discovers eFax's Extensive Obligations to
              IGC ....................................................................................5

       D.     June 30, 2000:  IGC, j2 and eFax Enter into the Agreement of
              Understanding and Agree to a Comprehensive Mutual
              Release of All Claims, Known and Unknown ............................6

       E.     March 2002, October, 2004 and November 2009: j2
              Threatens IGC and One of Its Resellers with Infringement on
              Three Occasions but Does Nothing ........................................7

       F.     2012: j2 Sues IGC on the Patents-In-Suit and Advances a
              Novel Interpretation of the Release Which Judge Pregerson
              Finds Unpersuasive ..............................................................8

ARGUMENT .................................................................................................9

I.     ABSENT A SHOWING OF FRAUD, DECEPTION OR MISREPRESENTATION,
       CALIFORNIA COURTS ENFORCE RELEASES ACCORDING TO THEIR
       TERMS ..............................................................................................10

II.    IGC HAS PROPERLY STATED A CLAIM THAT j2 HAS RELEASED
       PATENT CLAIMS INVOLVING IGC'S MAXEMAIL SYSTEM ARISING
       FROM THE PATENTS-IN-SUIT ..............................................................10

       A.     j2 Had Actual Knowledge of the Claims It Was Releasing
              When It Gave the Release Because It Had Already Filed the
              Claims with the USPTO ........................................................10

- i -

1.   IGC's MaxEmail System Is Substantially the Same as
     When j2 Gave the Release, Making j2's Claimed
     Distinction Between "Past" and Future Released
     Claims Irrelevant ........................................................................ 12

2.   j2's Patent Claims "Arise From" or at Least "Relate
     to" the Software, Equipment and Other Assets
     Provided by IGC to j2 ................................................................ 13

B.   Alternatively, the Broad Language of the General Release
     Captures the Patent Claims ................................................................ 14

   1.   j2's "Public Policy" Arguments Are Flawed ................................. 14

   2.   j2's Unspoken Belief That the Release Was Not
        Intended to Cover the Patent Claims is Irrelevant ....................... 17

   3.   The Scope of the General Release and Waiver of
        Section 1542 Is a Triable Issue of Fact ........................................ 17

III.   j2's REFERENCES TO PAROL EVIDENCE WARRANT DENIAL OF THE
       MOTION ........................................................................................................ 18

A.   IGC Pleads in the Alternative That If the Contract Is
     Ambiguous, the Parol Evidence, Including the Intent of the
     Parties, Supports Its Interpretation .......................................................... 18

B.   If Necessary, Extrinsic Evidence Is Admissible to Show an
     Ambiguity ................................................................................................ 19

C.   The Court Should Not Consider the Extra-Pleading
     Submissions by j2 Without Giving IGC an Opportunity to
     Present Evidence Supporting Its Interpretation ....................................... 20

IV.   j2's CHARACTERIZATION OF THE RULING IN THE NORTHERN DISTRICT
      OF GEORGIA IS INCORRECT ....................................................................... 21

V.   j2's VENUE ARGUMENTS ARE MISPLACED ................................................ 23

CONCLUSION ................................................................................................................. 24

**TABLE OF AUTHORITIES**

PAGE

**Cases**

*Abifadel v. Cigna Ins. Co.*, 9 Cal. Rptr. 2d 910 (Cal. Ct. App. 1992) .......................................... 19

*Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 120 F. Supp. 2d 273 (S.D.N.Y. 2000) .................................................................................................................................. 14

*AVX Corp. v. Cabot Corp.*, 424 F.3d 28 (1st Cir. 2005) ........................................................... 23

*Bardin v. Lockheed Aeronautical Sys. Co.*, 82 Cal. Rptr. 2d 726 (Cal. Ct. App. 1999) .................................................................................................................................. 10

*Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439 (9th Cir. 1986) ............................... 15

*Burch v. Premier Homes, LLC*, 131 Cal. Rptr. 3d 855 (Cal. Ct. App. 2011) ............................ 19

*Butler v. The Vons Companies, Inc.*, 45 Cal. Rptr. 3d 151 (Cal. Ct. App. 2006) ...................... 17

*Casey v. Proctor*, 378 P.2d 579 (Cal. 1963) ............................................................................. 16

*DuBois v. Sparrow*, 154 Cal. Rptr. 717 (Cal. Ct. App. 1979) .................................................. 18

*Edwards v. Comstock Insurance Co.*, 252 Cal. Rptr. 807 (Cal. Ct. App. 1988).......................... 17

*Fuentes v. Shevin*, 407 U.S. 67, 94 (1972) ................................................................................ 24

*Garcia v. Truck Ins. Exchange*, 682 P.2d 1100 (Cal. 1984) .................................................... 19

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) ..................................................... 9

*Global Network Communications, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) .................................................................................................................................. 21

*Grebe v. McDaniel*, 71 Cal. Rptr. 662 (Cal. Ct. App. 1968) .................................................... 18

*Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir. 1970) ................................................ 24

*In re Reynoso*, 477 F. 3d 1117 (9th Cir. 2007) ......................................................................... 23

*j2 Global, Inc. v. Integrated Global Concepts, Inc.*, 2012 WL 3257778 (C.D. Cal. Aug. 7, 2012) .......................................................................................................................... 9

*Jadwin v. County of Kern*, 610 F. Supp .2d 1129 (E.D. Cal. 2009)........................................... 24

*Jefferson v. Cal. Dept. of Youth Auth.*, 48 P.3d 423 (Cal. 2002) ............................................. 14

*Larsen v. Johannes*, 86 Cal. Rptr. 744 (Cal. Ct. App. 1970) ................................................... 15

*Leaf v. City of San Mateo*, 163 Cal. Rptr. 711 (Cal. Ct. App. 1980) ....................................... 18

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)......................................................... 21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005)...................... 9

*Lizalde v. Advanced Planning Servs.*, 2012 WL 2374882 (S.D.Cal., June 22, 2010) .................................................................................................................................. 16

*M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 10 (1972) ..................................................... 24

*Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir. 1988) ............................. 24

*Marder v. Lopez*, 450 F. 3d 445 (9th Cir. 2006) ....................................................................... 20

*Mitchell v. Union Central Life Ins. Co.*, 13 Cal. Rptr. 3d 732 (Cal. Ct. App. 2004) ............... 18

*Neverkovec v. Fredericks*, 87 Cal. Rptr. 2d 856 (Cal. 1999) .................................................... 20

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Co.*, 69 Cal. 2d 33 (Cal. 1968)................... 20

*San Diego Hospice v. San Diego*, 37 Cal. Rptr. 2d 501 (Cal. Ct. App. 1995)........................... 15

*Skrbina v. Fleming Cos.*, 53 Cal. Rptr. 2d 481 (Cal. Ct. App. 1996) ................................. 10, 17

*Solis v. Kirkwood Resort Co.*, 114 Cal. Rptr. 2d 265 (Cal. Ct. App. 2001) ............................. 19

*Spence v. U.S.*, 629 F. Supp. 2d 1068 (E.D.Cal. 2009).............................................................. 10

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) ........................................................................... 21

*Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049 (C.D. Cal. 2008)................................... 9

*Winet v. Price*, 6 Cal. Rptr. 2d 554 (Cal. Ct. App. 1992) ............................................................ 15

*Wyler Summit P'ship v. Turner Broad. Sys., Inc*., 135 F.3d 658 (9th Cir. 1998) ........................... 9

**Statutes**

Cal. Civ. Code §1541 ..................................................................................................................... 10

Cal. Civ. Code §1542 ........................................................................................................ 7, 13, 16

Cal. Civ. Code §1644 ..................................................................................................................... 17

Cal. Civ. Code §1650 ..................................................................................................................... 17

Cal. Civ. Code §1856(g) ................................................................................................................ 19

**Rules**

Fed. R. Civ. P. 12(b) ...................................................................................................................... 20

Fed. R. Civ. P. 54(b) ...................................................................................................................... 23

Fed. R. Civ. P. 58 .......................................................................................................................... 22

**Regulations**

37 C.F.R. 1.101-1.127 ................................................................................................................... 11

**Now Comes** Plaintiff Integrated Global Concepts, Inc. (*"IGC"*), by and through its undersigned attorneys, and for its Response to Defendants j2 Global, Inc. f/k/a JFAX.COM, Inc. and Advanced Messaging Technologies, Inc.'s (collectively, *"j2"*) Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) or, in the Alternative, to Transfer Venue (the *"Motion"* and IGC's response thereto, the *"Response"*), respectfully states as follows:

**Summary**

j2 presented the very same arguments regarding the scope of the Release, public policy, collateral estoppel in the Georgia case, and venue to Judge Pregerson, and he found all of these arguments unpersuasive. This Court should reach the same conclusion and find that IGC has properly stated a claim in this matter. First, the language of the Release favors IGC's interpretation. j2 offers a flawed interpretation of the disputed term "Merger Party Claims," in which it asks the Court to conclusively interpret "past services, equipment, software or other assets provided by IGC to the Merger Parties [*i.e.*, j2 and eFax]" in a grammatically incorrect fashion to mean not only past services, but past equipment, past software, and past other assets. In addition to being grammatically incorrect, this would significantly alter and narrow the scope of the Release in a way that is not apparent from the face of the document. Since j2's interpretation conflicts with the face of the document, j2 would have to introduce extrinsic evidence to support this interpretation, but it has not done so. At the very least, IGC has alleged that the parol evidence would show that the parties intended to Release these claims. IGC is entitled to have any inferences on these points drawn in its favor.

Even if j2's interpretation were credited, IGC's Complaint alleges that there is no distinction between IGC's "past" and "present" system because MaxEmail has been substantially unchanged since the Release was executed. A "past services" limitation is therefore a distinction without a difference in this case. Moreover, as described below, although IGC had extensive dealings with eFax because IGC created the eFax fax-to-email system, until the Agreement of Understanding containing the Release was executed, IGC had no business dealings whatsoever with j2. Yet the Release clearly applies equally to both of the Merger

- 1 -

Parties, *i.e.,* j2 and eFax.  Therefore, reading the Release as limited to "past" claims IGC might have against j2 would make no sense, because IGC had no dealings with j2 until executing the Agreement of Understanding in which j2 gave the Release.  Thus, IGC had no "past" claims to Release.

Further, contrary to j2's assertion, IGC alleges that j2 had actual knowledge of the claims it was releasing as well as specifically IGC's purported infringement years before it executed the Release.  j2 had submitted patent applications as early as 1997 asserting the claims it purported to charge IGC with infringing in the Central District Action.  j2 also would have known that IGC potentially infringed the claims because it had access to the eFax system that mirrored MaxEmail, and it also licensed IGC's software and source code and obtained other documentation that would have disclosed how IGC's system worked.  It might be different if j2 were alleging that IGC had later created a new product separate from MaxEmail that infringed, but j2's claims relate solely to MaxEmail, which has been publicly marketed since 1998.  Given that the Release unambiguously covers unmatured, unknown, and unsuspected claims, and the broad scope of the Section 1542 waiver, these claims fall within the scope of the Release.

Even putting aside j2's actual knowledge, which should be dispositive, the general release is enforceable as there is nothing contrary to public policy about j2's general release of unknown claims involving MaxEmail.  First, as a threshold matter, there is nothing in the record to substantiate any infringement by IGC.  The Court cannot dismiss IGC's Complaint based on the bare assertion by j2 that IGC infringes the patents and therefore that the Release is automatically void on public policy grounds.  Not only does IGC believe that the filing of the suit itself violates the Covenant Not to Sue, but IGC also denies infringement, and it is entitled to have inferences drawn in its favor on this point.  Second, the public policy cases cited by j2 largely deal with individuals and have little application in the commercial context.  j2 is a publicly traded corporation that drafted the Release in question with sophisticated counsel, and it should not be entitled to the same deference that an unsophisticated injured individual might receive.

Finally, j2's arguments about the Georgia case are flawed in numerous respects. First, Judge Pregerson found the Georgia case inapposite because IGC's Complaint in this case had corrected the pleading deficiencies identified by the Georgia Court. Second, although the Agreement of Understanding was referenced in the briefing, IGC was even not suing for a breach of that agreement. Third, the Georgia case involves an entirely different set of patents, called the AudioFAX Patents, that are unrelated to the Patents-In-Suit. Fourth, the Georgia case involves different parties and was brought by a different entity called Catch Curve that appears to be a j2 subsidiary. Fifth, the Georgia court never held that it was making a dismissal on the merits. Sixth, even if Georgia court had so held, the referenced order is not final because that case is ongoing, and that order will not become final until all claims are resolved.

j2 also asks that the Court to transfer the case back to Judge Pregerson notwithstanding his ruling that the case should proceed here. However, there is no basis to transfer the case because IGC's claims are not in any way related to the matters pending before that Court. It makes no difference whether IGC infringes the Patents-In-Suit if they are covered by the Release. Additionally, this matter is governed by an irrevocable forum selection clause inserted by j2 that fixes venue in this Court. Since j2 barely mentions any of the other discretionary factors, it has failed to overcome the strong presumption of enforcement of forum selection clauses in the Ninth Circuit and IGC's choice of forum. The Motion should be denied.

## BACKGROUND

Plaintiff IGC, founded in 1992, is a small, family-owned and operated business with 6 employees that operates out of the ground floor of a house on Chicago's North Side. ¶10.[1] IGC was an early entrant in the Internet facsimile business under its FaxEmail and MaxEmail trade names. ¶11. j2 is a $1.3 billion dollar publicly traded corporation headquartered in Hollywood, California. ¶3. j2 claims to be the holder of U.S. Patent Nos. '638, '688, '132, and '066 (the *"Patents-In-Suit"*). ¶12. On April 20, 2012, j2 filed a Complaint for Patent Infringement and

---

[1]   Paragraph references in the Response relate to IGC's Complaint in the above-referenced matter unless otherwise stated.

- 3 -

Permanent Injunction against IGC in the U.S. District Court for the Central District of California (Case No. 12-cv-3439) asserting, *inter alia*, infringement of the Patents-In-Suit (the *"Patent Claims"*).

## I. THE TIMELINE OF EVENTS GIVING RISE TO IGC'S COMPLAINT

### A. April 1997-November 1998: j2 Files Patent Applications with the USPTO Claiming the Invention Which Is the Subject of the Patent Claims for the '638 and '688 Patents, Which Are the Subject of the Infringement Action

On April 1, 1997, two of j2's founders, Jack Rieley and Jaye Muller, filed a patent application with the U.S. Patent and Trademark Office (the *"USPTO"*) that would later issue as U.S. Patent Number 6,208,638 (the *"'638 Patent"*) on March 27, 2001, titled "Method and Apparatus for Transmission and Retrieval of Facsimile and Audio Messages Over a Circuit or Packet Switched Network." ¶12. On June 12, 1998, the application that would become U.S. Patent No. 6,597,688 (the *"'688 Patent"*) was filed. j2 claims to be the owner of this patent, which is titled "Scalable Architecture for Transmission of Messages Over a Network." ¶13. Subsequently, j2 filed a continuation patent application claiming priority to the application which resulted in the "'688 Patent, which later issued as U.S. Patent No. 7,020,132 (the *"'132 Patent"*). ¶14. Therefore, all of the patent applications for the Patents-in-Suit were on file before the end of 1998. The '638 Patent, the '688 Patent, and the '132 Patent were all filed by j2 employees. The '066 Patent was filed on November 5, 1998, but was later assigned to j2. ¶114.

### B. September-November 1998: IGC Develops the Software, Equipment and Other Assets to Launch the eFax Service

On August 10, 1998, IGC was approached by a company called JetFax to develop a fax-to-email business line for JetFax. ¶17. JetFax sensed a slowdown in its traditional paper fax machine business and believed that providing fax-to-email services was necessary for its future, so it entered into an agreement with IGC to rebrand IGC's FaxEmail and MaxEmail offerings under a new banner, eFax.com. ¶¶20-21. After an intensive development period, IGC

rolled out the system for JetFax in November 1998. ¶18. This system was designed by IGC and operated by IGC on its own servers, using IGC's own source code and intellectual property. ¶25. This project led to the transformation in February 1999 of JetFax into eFax.com (*"eFax"*). ¶22.

The agreements between IGC and eFax were embodied in a Software Development Agreement, executed on February 16, 1999 (the *"Development Agreement"*), a Co-Location Agreement, executed on February 16, 1999 (the *"Co-Location Agreement"*), and a Source Code Escrow Agreement dated February 24, 1999 (collectively, the *"February 1999 Agreements"*). ¶23. The February 1999 Agreements, *inter alia*, provided IGC with an exclusive contract to operate the eFax service using IGC's own systems, source code and intellectual property, and gave IGC other rights that extended for a five-year period. ¶24. Pursuant to the February 1999 Agreements, IGC, *inter alia*, provided all of the operational software, source code, system design, infrastructure management and intellectual property for the eFax service. ¶25. eFax's obligations to IGC were extensive and IGC retained significant rights to the eFax system. ¶28.

### C. Spring-Summer 2000: j2 Enters into Merger Discussions with eFax and Discovers eFax's Extensive Obligations to IGC

During this time, j2 and eFax began negotiating the terms of a merger agreement (the *"Merger Agreement"*) pursuant to which eFax would become a wholly owned subsidiary of j2. ¶27. However, at some point during these negotiations, j2 discovered eFax's extensive obligations to IGC, as well as the fact that IGC had retained the rights to the source code and other intellectual property for the eFax fax-to-email system it had originally developed for JetFax. ¶28. Also, IGC had performed services and developed software in addition to that which was required pursuant to the terms of the Development and Co-Location Agreements, which IGC believed required eFax to make additional payments to IGC. ¶29. eFax denied that these services were additional, and instead believed that the services were encompassed within

the existing agreements.  ¶30.  IGC also knew that j2 was trying to patent certain fax-to-email technology at the time.  ¶84.

**D.    June 30, 2000:  IGC, j2 and eFax Enter into the Agreement of Understanding and Agree to a Comprehensive Mutual Release of All Claims, Known and Unknown**

In order to fully and completely settle all claims between j2, IGC and eFax, and to allow the merger to go forward, the parties entered into that certain Agreement of Understanding on June 30, 2000.  ¶32.  As an essential part of the Agreement of Understanding, the parties mutually executed a comprehensive release (the *"Release"*).  ¶33.  As detailed below, IGC has alleged, and the evidence will show, that j2's claims "arise from or relate to" IGC's services, equipment or software.

In connection with the Agreement, j2 gave IGC a broad covenant not to sue (the *"Covenant Not to Sue"*) wherein it agreed "never to institute or maintain against" IGC any action or proceeding relating to IGC's past services, equipment, software or other assets.  ¶34. The Agreement of Understanding also incorporates several other agreements between j2 and IGC, such as the Software License Agreement dated June 30, 2000, wherein j2 obtained a comprehensive license to IGC's source code and other systems.  ¶37.  The Agreement of Understanding also incorporates the Transition Services Agreement dated June 30, 2000, wherein IGC was required to teach j2 personnel how IGC's system operated and to assist in the migration of the eFax customers acquired by j2 under the Merger Agreement to a new system within j2.  ¶¶40-46.  IGC even provided j2 with a detailed Confidential Memorandum, which described its entire system architecture and how its software and other equipment operated. ¶44.  Therefore, while there is no requirement under the Release for IGC to show that j2 was on notice of the alleged infringement, IGC has alleged, and the evidence will show, that j2 had actual or constructive knowledge of IGC's purported infringement when it executed the Release and Covenant Not to Sue.

- 6 -

Even if j2 lacked any actual or constructive notice of the infringement claims, the parties expressly agreed to waive any protections afforded by California Civil Code §1542, which could otherwise prevent a waiver of unknown unmatured or unsuspected claims.  Instead, the parties clarified that the Release applied to unknown unanticipated and undisclosed claims.  ¶35.  In fact, the Section 1542 waiver was of such significance that the parties agreed that the contract would fail for lack of consideration were it not included.  ¶69; *Agreement* §6.[2]

E.   **March 2002, October, 2004 and November 2009: j2 Threatens IGC and One of Its Resellers with Infringement on Three Occasions but Does Nothing**

In March 2002, shortly after the transition services had been completed, j2 sent IGC letters through its licensing agent, EKMS, Inc., threatening to sue IGC for infringement of the '638 Patent.  ¶58.  On April 2, 2002, IGC responded by letter to j2's general counsel, noting the extensive information IGC provided to j2 through the Agreement of Understanding and related agreements.  ¶59.  On November 13, 2009, another one of j2's licensing agents, IP Investments Group, Inc., sent a letter to IGC threatening to file suit for infringement of, *inter alia*, the '638, '688 and '132 patents.  ¶85.  Also, on November 13, 2009, IP Investments Group, Inc. sent a letter to Meixler Technologies, Inc., IGC's reseller, threatening to file suit for infringement of, *inter alia*, the '638, '688 and '132 patents.  ¶86.  Meixler Technologies, Inc. had been previously targeted by j2's licensing agent, EKMS, Inc., in October 2004.  The logical inference is that j2 took no further action because j2 understood that it had already released these claims and given IGC a covenant not to sue.[3]

---

[2]   IGC's reference to documents outside the pleadings submitted or referenced by j2 is for the Court's convenience and should not be deemed an admission that it is appropriate to consider these documents.

[3]   Moreover, the fact that j2 was aware of IGC's purported infringement for over 10 years but did nothing to enforce its rights severely undermines any claim that IGC could be "willfully" infringing these patents. j2's repeated failure to take any action to enforce its rights casts substantial doubt on whether j2 believed that IGC was infringing at all.  In fact, this was one of the factors cited by Judge Pregerson in granting IGC's Motion to Transfer.  *Pregerson Ruling* at 2.

### F.   2012: j2 Sues IGC on the Patents-In-Suit and Advances a Novel Interpretation of the Release Which Judge Pregerson Finds Unpersuasive

Here, j2 asks the Court to find that the extremely broad language of the Release, which it drafted (¶75), does not cover j2's right to sue IGC for infringement of certain patents which it knew were pending when it gave the Release (¶54) and, with perhaps one exception, were all filed by j2's employees (¶15). j2 offers a grammatically incorrect interpretation of the disputed term "Merger Party Claims" that is contrary to the plain language of the Release, arguing that the Court should interpret "past services, equipment, software or other assets provided by IGC to the Merger Parties [*i.e.*, j2 and eFax]" to mean *past* services, *past* equipment, *past* software, and *past* other assets. But this is not what the agreement says. *Agreement of Understanding*, ¶5(a) ("each of the Merger Parties will release and fully discharge each of the IGC Parties, from any and all claims, demands and liabilities of whatever kind, whether presently known or unknown, suspected or alleged … arising from or related to any past services, equipment, software or other assets provided by IGC to [j2 and eFax]"). Reading a "past" limitation into "equipment, software or other assets" would rewrite the Release and would materially narrow its scope. But even if the language is interpreted to mean that IGC was only released from any claims relating to past *services*, there is no such limitation with respect to "equipment, software and other assets," *i.e.*, MaxEmail. In fact, as IGC has alleged, the most reasonable interpretation is that the "past services" referenced in the Agreement pertain to operating the eFax system (¶24) as distinct from the future claims involving software, equipment and other assets.

J2's interpretation is also flawed because all of the performance that IGC was required to render to j2 under the Agreement of Understanding and the agreements incorporated therein would all occur in the future (*e.g.*, the transition services, software license, source code transfer, and related items). ¶¶37-48. IGC had no prior dealings with j2 until j2 wanted to acquire IGC's business partner eFax, and entered into the Agreement of Understanding in June of 2000. ¶¶27-30. Rather, all of its prior dealings had been with eFax. ¶¶17-26. Thus, reading the

- 8 -

Release as limited to past claims IGC had against j2 would make no sense, as no such claims could have existed.  Further, reading the Release as being limited to IGC's past services to eFax would be contrary to the express language of the Release, because both j2 and eFax are "Merger Parties" under the Release.  Therefore, IGC can show that the Patent Claims are covered by the Release by showing that they arise from or relate to IGC's equipment, software, or other assets (*i.e.*, MaxEmail), even if they were contingent or unanticipated when j2 executed the Release.  Alternatively, IGC can show that the Patent Claims are within the scope of the Release by showing that the MaxEmail system is substantially the same one that was licensed to eFax/j2 and arises from or relates to a "past service" IGC provided to the Merger Parties.  As described below, IGC can succeed on both accounts.

**ARGUMENT**

j2 presented precisely the same arguments to Judge Pregerson regarding the scope of the Release in opposing IGC's motion to transfer proceedings to this Court, but he found them unpersuasive.  *j2 Global, Inc. v. Integrated Global Concepts, Inc.*, 2012 WL 3257778 *1-2 (C.D. Cal. Aug. 7, 2012) (the *"Pregerson Ruling"*).  So should this Court.  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court construes the complaint in the light most favorable to the non-moving party.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The court must accept all well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff.  *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  Under Ninth Circuit law, there is a "powerful presumption against rejecting pleadings for failure to state a claim."  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997) (internal citation omitted).  A motion to dismiss a claim for breach of contract should therefore not be granted where the contract "leaves doubt as to the parties' intent."  *Id.*; *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1069 (C.D. Cal. 2008).  In this case, even if the Court considers j2's inappropriate submissions, the Motion should be denied.

## I. ABSENT A SHOWING OF FRAUD, DECEPTION OR MISREPRESENTATION, CALIFORNIA COURTS ENFORCE RELEASES ACCORDING TO THEIR TERMS

It is well established that a release extinguishes any obligations covered by its terms, provided that it has not been obtained by fraud, deception, misrepresentation or undue influence. CAL. CIV. CODE §1541; *Spence v. U.S.*, 629 F. Supp. 2d 1068 (E.D. Cal. 2009), *aff'd* 374 Fed. Appx. 717 (9th Cir. 2010); *Bardin v. Lockheed Aeronautical Sys. Co.*, 82 Cal. Rptr. 2d 726, 731 (Cal. Ct. App. 1999) (*citing Skrbina v. Fleming Cos.*, 53 Cal. Rptr. 2d 481, 489 (Cal. Ct. App. 1996)). As the court recognized in *Bardin*, "'[t]he general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents....' " *Bardin*, 82 Cal. Rptr. 2d at 732 (*quoting Skrbina*, 53 Cal. Rptr. 2d at 89). As described below, j2 not only bargained for but drafted the broad release that it now seeks to repudiate based on "public policy" grounds. This Court should reject j2's premature and flawed interpretation of the Release.

## II. IGC HAS PROPERLY STATED A CLAIM THAT j2 HAS RELEASED PATENT CLAIMS INVOLVING IGC'S MaxEmail SYSTEM ARISING FROM THE PATENTS-IN-SUIT

### A. j2 Had Actual Knowledge of the Claims It Was Releasing When It Gave the Release Because It Had Already Filed the Claims with the USPTO

j2's primary argument is that it did not knowingly release the Patent Claims because the Patents-In-Suit had not been formally issued by the USPTO. However, j2 does not dispute that it has submitted all of the patent applications that contain the claims giving rise to the Patent Claims no later than 1998, approximately two years prior to the execution of the Agreement of Understanding. The Release unambiguously covers "any and all claims, demands and liabilities of whatever kind, whether presently known or unknown, suspected or alleged." ¶36. As such, regardless of when the Patents-In-Suit were finally issued by the USPTO, j2 had actual knowledge of the claims when it gave the Release.

Further, although unknown and unmatured claims are covered by the Release, j2 also does not dispute that the Agreement of Understanding incorporates several other agreements between j2 and IGC wherein j2 obtained a comprehensive license to IGC's source code and

other systems.  ¶38.  The Agreement of Understanding also incorporates the Transition Services Agreement dated June 30, 2000, wherein IGC was required to teach j2 personnel how IGC's system operated and to assist in the migration of the eFax customers acquired by j2 under the Merger Agreement to a new system within j2.  ¶¶40-45.  Further, Nehemia "Hemi" Zucker and Richard Ressler, the j2 officers who oversaw the transition services provided by IGC, are both still employed at j2 and have carried this knowledge with them since at least as early as 2000. ¶39.  Specifically, Ressler oversaw and was intimately involved in the execution of the Transition Services Agreement, which was a part of the Agreement of Understanding.  *Id*.  j2's employees are also the named inventors for all but one of the Patents-In-Suit.   ¶¶15-16. Therefore, while there is no requirement under the Release for IGC to show that j2 was on notice of the claims it was releasing, the evidence will show that j2 had actual or constructive knowledge of IGC's systems and any purported infringement when it executed the Release and Covenant Not to Sue.  Given that j2 knew the patent claims it is now suing on were pending when it executed the Release, it could have easily carved out the Patent Claims from the Release.  It did not do so.

j2's position is also inconsistent with the patent prosecution process.  In the USPTO, applicants file claims with the application that generally describe the invention broadly, and then, during prosecution, the claims are usually narrowed due to the rejections by the examiner assigned to the case.  *See, e.g.*, 37 C.F.R. 1.101-1.127.  Therefore, j2 was certainly aware of the universe of claims it later released when it submitted the patent applications in 1997 and 1998. j2 could only get narrower patent claims when the patent ultimately issued.  The fact that some of the claims might not have survived the examination process and were not allowed does not diminish j2's knowledge of the scope of the release.[4]

---

[4] j2 would have also received periodic communications, known as office actions, from the USPTO with respect to the allowability of the pending claims.  Therefore, during prosecution, or earlier if j2 had done a patent search, which it almost certainly would have done, j2 would have had a good an idea by 1998 or 1999 of what patent claims would eventually be granted and, therefore, what it was giving up by the release.  *See, e.g.*, 37 C.F.R. 1.101-1.127.

- 11 -

1

    **1.**     **IGC's MaxEmail System Is Substantially the Same as**
          **When j2 Gave the Release, Making j2's Claimed**

2                **Distinction Between "Past" and Future Released Claims**

3                **Irrelevant**

       j2 does not offer any evidence or argument to contradict the allegations in the Complaint

4 that IGC's MaxEmail system is substantially the same service that it was at the time j2 gave the

5 Release and Covenant Not to Sue. ¶¶63, 93, 94. At the time, IGC's MaxEmail system, the

6 same system as eFax, was cobranded with the eFax label and co-located on IGC's systems.

7 ¶¶49; 23-25. The only potentially infringing service, software or equipment that j2 alleges in its

8 Complaint is MaxEmail. *j2 Complaint,* ¶¶17-31. Therefore, since there is no meaningful

9 distinction between present-day MaxEmail and the MaxEmail that existed when the Agreement

10 of Understanding was executed, the "past" distinction identified by j2 is irrelevant.[5]

11        It might be a different story if j2 had alleged that IGC had developed a new product

12 other than MaxEmail after the execution of the Agreement of Understanding that infringed the

13 Patents-In-Suit, but j2's infringement claims relate solely to MaxEmail. *See j2 Complaint*,

14 ¶¶17-31, 36, 41, 46, 51. MaxEmail has also been the only "service" offered by IGC since at

15 least 1998, and IGC has no "equipment, software, or other assets" other than what is used to

16 provide its MaxEmail service. ¶63, 112. Therefore, even if the Court were to accept j2's

17 interpretation that the Release only covers "past" services offered by IGC prior to execution of

18 the Agreement of Understanding, j2 has offered nothing to show that IGC's "past" services are

19 any different from the "present" system which j2 now alleges infringes the Patents-In-Suit.

20 Without any evidence or claim submitted by j2 to show that IGC's present system is different

21 from the one covered by the Release, the Release can pertain to only one thing: MaxEmail.

22

23

24

---

25 [5]     It is noteworthy as well that j2 has failed to attach a copy of its Complaint in the Central District Action.

26 IGC does not believe matters outside the pleadings should be considered. However, given that j2 has asserted that the Court should take "judicial notice" of certain documents, in the event that the Court

27 undertakes its own effort to review the Complaint, IGC provides limited references to the Complaint in the Central District Action solely to show that the Complaint relates to MaxEmail.

28

## 2. j2's Patent Claims "Arise From" or at Least "Relate to" the Software, Equipment and Other Assets Provided by IGC to j2

j2 also seizes on a mid-sentence phrase in the Release, arguing that the Release should be limited to what was provided by IGC to j2. This argument is flawed. At the time it gave the Release, j2 knew that it had already filed claims with the USPTO in attempting to patent fax-to-email systems, which meant that fax-to-email systems like IGC's MaxEmail would infringe. The Release cannot be fairly read to permit a new patent infringement suit every time a new consumer signed up for MaxEmail after the Release is executed. j2 is also not suing consumers it is suing IGC for claims arising from its MaxEmail software that was licensed by j2 in 2000. Also, j2 knew that IGC was selling MaxEmail to consumers at the time it gave the Release because it was a competing product that was publicly marketed, and j2 licensed IGC's software and source code. ¶31. The Release also covers unknown, unanticipated or undisclosed claims, and contains a waiver of California Civil Code §1542. ¶¶33, 35.

j2 had also already submitted patent applications for the sole purpose of obtaining the exclusive legal right to sell fax-to-email services for the period permitted by the patent laws. The logical inference is that j2 submitted these patent applications for the purpose of trying to exclude software like IGC's MaxEmail from the marketplace, so the evidence will show that these are known claims arising from or relating to MaxEmail. Additionally, this argument cannot be squared with the express language of the Release, which releases claims "arising from or relating to" IGC's software. The Patent Claims must "arise from" IGC's MaxEmail system, which provides fax-to-email services to consumers, as no other infringing product is identified in j2's Complaint. *j2 Complaint*, ¶¶17-31. But the Release is actually broader than that; it releases any and all claims that are even "related to" what was provided by IGC to j2, *i.e.*, MaxEmail. IGC's sale of fax-to-email services to consumers does not only "arise from" and "relate to" MaxEmail, it is the primary function served by MaxEmail.[6]

---

[6] Again, it might be different if j2 claimed that IGC had developed some new product or service that j2 clamed infringed. But its infringement claims relate only to MaxEmail, which is what IGC has alleged it provided to the Merger Parties. ¶¶37-42.

- 13 -

Here, j2 made a business decision to give IGC the broad Release it now seeks to enforce in order to cut off any future claims by IGC to the eFax brand or to impede j2's acquisition of eFax.  ¶¶27-31, 47, 72-78.  j2 could have made any number of choices that would have preserved its right to sue IGC for infringement.  For example, it could have continued to perform on eFax's obligations to IGC under the Co-Location and Software Development Agreement until they expired, or it could have called off the merger.  Instead, it made the decision to license IGC's MaxEmail system and negotiate a broad mutual release of any claims relating thereto in order to get IGC out of the picture and transition the eFax customer base to a new system within j2 so that it could consummate its merger with eFax.  ¶¶31-38.  It is also worth noting that j2 enjoyed significantly greater bargaining power than IGC with regard to the Agreement of Understanding.  ¶80.  j2, a publicly traded company, was dealing with a small business.  The Court should afford IGC the benefit of its bargain and allow IGC to present evidence supporting its claims.

### B.  Alternatively, the Broad Language of the General Release Captures the Patent Claims

The purpose of a general release is to protect the beneficiary from having to enumerate every claim that the opposing party might allege, and thereby avoid the risk of omitting a claim that might later give rise to liability.  *Jefferson v. Cal. Dept. of Youth Auth.*, 48 P.3d 423, 427 (Cal. 2002).  Accordingly, a party's release of all actions "whatsoever" is sufficiently broad to cover known Patent Claims.  *See Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 120 F. Supp. 2d 273, 282-83 (S.D.N.Y. 2000).  As described above, IGC has alleged, and the evidence will show, that the Patent Claims were known to j2 when it executed the Release.  But even if they were not, the general release not only is sufficiently broad to cover the Patent Claims but is enforceable under California law notwithstanding j2's "public policy" arguments.

### 1.  j2's "Public Policy" Arguments Are Flawed

j2's primary arguments against enforcing the Release and Covenant Not to Sue it drafted are to claim it is unenforceable for "public policy" reasons because it would be akin to releasing

- 14 -

an intentional tort and that willful patent infringement is a type of intentional tort.  As a threshold matter, there is nothing in the record to substantiate a claim that IGC is even infringing any of j2's patents, let alone in an intentional manner.  j2 cannot make a bare allegation of "willful" infringement to support a motion to dismiss and have the Court draw the inference that IGC has engaged in conduct that violates public policy.[7]

In any case, the "public policy" concerns regarding intentional torts cited by j2 do not apply to commercial transactions, and a waiver of §1542 in the Release is a valid waiver of future claims.  *See, e.g.*, *Brae Transp., Inc.* v. *Coopers & Lybrand*, 790 F.2d 1439, 1444–45 (9th Cir. 1986) (declining to apply rationale of personal injury cases to commercial release).  Rather, no such policy applies to a commercial transaction, and a release in such a transaction is valid under general law.  *See Larsen* v. *Johannes*, 86 Cal. Rptr. 744, 753 (Cal. Ct. App. 1970) (landowners' release of architect); *Winet* v. *Price*, 6 Cal. Rptr. 2d 554, 559 (Cal. Ct. App. 1992) (client's release of attorney in settlement of attorney's action to recover legal fees); *San Diego Hospice* v. *San Diego*, 37 Cal. Rptr. 2d 501, 504 (Cal. Ct. App. 1995) (land purchaser's release of seller with respect to future claims of contamination of land was intended to cover eventuality of unknown source of contamination and included express waiver of protections under §1542).  Thus, under California law, this exception is not applicable to commercial transactions like the Agreement of Understanding.

Here, in the waiver provision, the parties expressly agreed to waive future claims.  ¶35; *Agreement,* §6 ("Each of IGC, eFax and JFAX waives all rights and benefits which it now has *or in the future may have* under and by virtue of the provisions of California Civil Code

---

[7]  The argument is also circular; if j2 previously released IGC from claims relating to MaxEmail, IGC cannot be committing an "intentional tort" by operating its MaxEmail system.  j2's argument would essentially render all releases of patent infringement claims unenforceable, if for no other reason than each release would have to set forth each and every actual or future claim that would be released.  This would be impossible, as patents are also often subject to reexamination proceedings and new claims issue.  If j2's position were the law, it could sue again every prior released party on its new claims under the theory that its prior releases were void for "public policy" reasons.  j2 would also be estopped from making this argument in this case because it drafted the provisions which it now claims are violations of public policy.  Notwithstanding all of these considerations, the evidence will show that j2 knew about the Patent Claims under its pending patents when it gave the Release, so the "public policy" argument is inapposite.

§1542…") (emphasis added).  Contrary to j2's assertion, courts will enforce these provisions upon a showing that the parties consciously understood and agreed that this was the effect of their release.  *Casey v. Proctor*, 378 P.2d 579, 586-87 (Cal. 1963).

Further, this case does not involve an unsophisticated claimant who is presented with a form release on a "take it or leave it" basis and signs the release without the benefit of counsel, conferring a windfall on IGC.  To the contrary, j2 is a publicly traded company that was represented by sophisticated counsel that drafted the Release.  ¶¶76-77.[8]  j2's attempt to avoid the Release is also contradicted by the breadth of the Release, which protects IGC against "all rights and benefits which it now has or in the future may have under and by virtue of the provisions of California Civil Code §1542, with the purpose and intent that the releases contained herein shall be construed as general and unqualified releases pursuant to the terms hereof."  ¶36; *Agreement*, §6.  j2 fails to explain how this phrase can be interpreted without concluding that the Release covers future claims.  Instead, j2 argues that the Release was limited to services provided by IGC to eFax and j2 predating the Agreement.  *Motion* at 10.  However, in addition to the above arguments that j2 knew about these claims, this contention cannot be squared with *Jefferson* and *Ackoff-Ortega*, where the Court enforced the general releases by their terms against sophisticated parties like j2.[9]

---

[8]  Although the Release contains a provision that purports to provide that the ambiguity is not construed against either party, a California statute provides that the ambiguity is construed against the drafter and there is no express waiver of this provision in the Agreement of Understanding, as with the Section 1542 waiver.  See, Cal. Civ. Code § 1654.  Therefore, it is unclear what effect this provision will have on construction.  However, if the Release is ambiguous, this is not a matter than can be decided on a motion to dismiss.

[9]  j2 relies on an unpublished opinion from the Southern District, *Lizalde v. Advanced Planning Servs.*, 2012 WL 2374882 *8 (S.D. Cal., June 22, 2010), which it cites for the proposition that the waiver of future unknown intellectual property rights is void as against public policy.  However, this case is inapposite because, as noted above, IGC's Complaint does not allege that j2 waived "future unknown" claims.  Rather, all of IGC's claims relate to claims that both were known to j2 and relate to the MaxEmail system that had been in operation for almost two years when the Release was executed.  In fact, in *Lizalde*, the party attempting to enforce the Release acknowledged in its brief that the conduct related to a future unknown claim.

- 16 -

### 2.    j2's Unspoken Belief That the Release Was Not Intended to Cover the Patent Claims is Irrelevant

Generally speaking, "a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." *Skrbina*, 53 Cal. Rptr. 2d at 488.  "If [j2] signed the release on the mere unspoken belief that the release did not encompass such claims, despite express language in the release to the contrary, [j2] may not now rely on [its] unspoken intention not to waive these claims in order to escape the effect of the release." *Skrbina*, 53 Cal.Rptr. 2d at 489 (*citing Edwards v. Comstock Insurance Co.*, 252 Cal. Rptr. 807, 810 (Cal. Ct. App. 1988)).

In straining to read the Patent Claims out of the Release, j2 ignores the unambiguous statement that the Release is general and unqualified (¶36), thus violating the fundamental rule that contractual language be interpreted in its ordinary sense.  *See* CAL. CIV. CODE §1644 (words in a contract are to be understood in their ordinary sense unless used by the parties in a technical sense).  IGC's interpretation of the Release is also consistent with the literal purpose of a general release, which is to extinguish all claims, regardless of whether they are known or have matured.  *Winet*, 6 Cal. Rptr. 2d at 562; *see also* CAL. CIV. CODE §1650 ("particular clauses of a contract are subordinate to its general intent").  j2's attempt to eviscerate the Release conflicts with the plain meaning of the Release, and j2's Motion should be denied.

### 3.    The Scope of the General Release and Waiver of Section 1542 Is a Triable Issue of Fact

Here, IGC does not merely seize upon an oblique reference to "all known and unknown" claims to show the parties intended the Release to comprehensively derogate Section 1542 of the California Civil Code.  Rather, IGC has alleged facts that show j2 consciously understood the benefits conferred by Section 1542 and the risks assumed by the Release and, after receiving counsel's advice, consciously waived such benefits and entered the agreement to extinguish all future obligations to IGC regarding MaxEmail.

It is also well settled that the scope of a waiver of unknown claims is a question of fact. *Butler v. The Vons Companies, Inc.*, 45 Cal. Rptr. 3d 151, 156 (Cal. Ct. App. 2006) (citing

- 17 -

*Proctor*, 378 P.2d 97 at 586-87; *Mitchell v. Union Central Life Ins. Co.*, 13 Cal. Rptr. 3d 732, 739-40 (Cal. Ct. App. 2004); *Leaf v. City of San Mateo*, 163 Cal. Rptr. 711, 718 (Cal. Ct. App. 1980); *DuBois v. Sparrow*, 154 Cal. Rptr. 717, 723 (Cal. Ct. App. 1979); *Grebe v. McDaniel*, 71 Cal. Rptr. 662, 663 (Cal. Ct. App. 1968)).  Assuming for the sake of argument that the Court finds that the Release does not unambiguously cover the Patent Claims, IGC can still carry its burden in this case by showing, as it has alleged (¶¶67, 70, 74), that the parties intended for the Release to be general and unqualified in nature and otherwise fall within the Section 1542 waiver.  IGC is entitled to all reasonable inferences regarding the parties' intent.  Thus, regardless of the approach taken, the Motion should be denied.

## III.    j2's References to Parol Evidence Warrant Denial of the Motion

### A.    IGC Pleads in the Alternative That If the Contract Is Ambiguous, the Parol Evidence, Including the Intent of the Parties, Supports Its Interpretation

j2's Motion contains disputed references to parol evidence and other matters outside the pleadings, including what the parties' "intent" was when the Agreement of Understanding was executed, and makes disputed characterizations of other cases.  *See, e.g., Motion*, p. 1 (Agreement was "intended" to govern similar services during transition period); §2 (disputed history of j2, Bobo and Catch Curve Patents); §3 (disputed history of the Central District Action); p. 9 ("intent" was not to resolve matters at issue in Central District Action).  j2's decision to introduce arguments regarding matters outside the four corners of the Agreement of Understanding suggests that the Court will need to take parol evidence in this matter.  The Court should not accept j2's one - sided presentation of the parol evidence without giving IGC an opportunity to present the same.  A motion to dismiss is not the appropriate vehicle to give consideration to these issues.

Further, IGC has pleaded in the alternative that if parol evidence is taken, it would show that the Release and Covenant Not to Sue cover the Patent Claims.  ¶¶66-81.  For example, the parol evidence would show that the parties intended the Release to cover these claims and that

j2's infringement claims are the same as any other claim arising from an alleged "defect" in IGC's service or software and fall within the scope of the Release.  ¶¶67-72.  IGC is entitled to have the Court draw any inferences in its favor regarding these allegations.

Additionally, the interpretation of ambiguous terms in a contract is normally a question of fact.  *See Abifadel v. Cigna Ins. Co.*, 9 Cal. Rptr. 2d 910, 919 (Cal. Ct. App. 1992).  Although it is a question of law as to whether an ambiguity exists, in California "an ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing."  *Solis v. Kirkwood Resort Co.*, 114 Cal. Rptr. 2d 265, 269 (Cal. Ct. App. 2001).  As detailed above, IGC has offered a semantically reasonable interpretation of the Release showing that it covers the Patent Claims, and the Motion should be denied.

Here, IGC has alleged that the parties recognized the possibility that additional unknown claims or causes of action may have existed at the time the Release was executed, but the parties intended to release all such claims or causes of action and intended that the Release be effective no matter what the subsequently discovered claim or cause of action might be.  *See, e.g.*, ¶74. j2 and eFax did not want IGC – a small fax-to-email business – to be able to do anything to further interfere with j2's acquisition of eFax, which is now their leading brand.  ¶46.

### B.    If Necessary, Extrinsic Evidence Is Admissible to Show an Ambiguity

Even if a contract is deemed integrated, the parol evidence rule does not bar evidence regarding "the circumstances under which the agreement was made or to which it relates," evidence to explain an extrinsic ambiguity, or evidence to otherwise interpret the terms of the agreement.  Cal. Code Civ. Proc., §1856(g); *Garcia v. Truck Ins. Exchange*, 682 P.2d 1100, 1103 (Cal. 1984); *see Burch v. Premier Homes, LLC*, 131 Cal. Rptr. 3d 855, 865 (Cal. Ct. App. 2011) ("'The fact that the terms of instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms'" and thus "'rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties'" including the circumstances surrounding the making of the agreement and object, nature, and subject matter of the writing); *Neverkovec*

- 19 -

*v. Fredericks*, 87 Cal. Rptr. 2d 856, 866 (Cal. 1999) ("[E]ven an apparently unambiguous general release is properly interpreted in light of the surrounding circumstances").  j2 offers no extrinsic evidence to support its contention that the Release does not cover j2's patent clams. Thus, if the Court does not find that the Release unambiguously covers the Patent Claims, the Court should allow IGC to present extrinsic evidence and provisionally consider it before determining whether it is admissible and whether the contract is, in fact, ambiguous at summary judgment.  *Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006)* (" 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' ") (*quoting Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Co.*, 69 Cal. 2d 33, 37 (Cal. 1968)); *Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 656 (Cal. Ct. App. 2004) ("Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.") (*quoting Pacific Gas & Elec. Co.*, 69 Cal. 2d at 39-40)). Accordingly, the law imputes to j2 "an intention corresponding to the reasonable meaning of [its] words and acts."  *Marder v. Lopez*, 450 F. 3d 445, 449 (9th Cir. 2006) (internal quotation marks omitted).

### C.   The Court Should Not Consider the Extra-Pleading Submissions by j2 Without Giving IGC an Opportunity to Present Evidence Supporting Its Interpretation

j2 has offered over 150 pages of extra-pleading submissions in support of its Motion. Although IGC has focused on the merits of its Complaint, for the record, IGC notes that the materials submitted by j2 should not be considered on a motion to dismiss.  Federal Rule of Civil Procedure 12(b) states that if matters outside the pleadings are considered, "the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56."  FED. R. CIV. P. 12(b).  (emphasis added).  "As a general rule, a district court may not consider any

material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (noting that the "matters of public record" exception is narrowly construed and that the Court may not take judicial notice "of the truth of the facts recited therein."). *Id.* at 690.

In this case, not only does j2's Motion request that judicial notice be taken of documents outside the Complaint, it seeks judicial notice of the contents of documents that are not public records. For example, j2 asks the Court to consider a letter sent by counsel for IGC not for the fact that a letter was sent, but for the substance of its contents. *See Johnson Dec.* at Ex. E. At the same time, j2 does not submit many of the documents that will be essential to a resolution of this case, such as the Patents-In-Suit, the Co-Location Agreement, the Development Agreement, any of the other documents referenced in IGC's complaint, or the pleadings in the Central District Action. Conversion is "strictly enforced" and "mandatory" when matters outside the pleadings are considered. *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (noting that summary judgment is the "proper procedural device to consider matters outside the pleadings"). IGC respectfully submits that if the submission of so many documents and contested facts is necessary, this is not the type of case that can be resolved on a motion to dismiss, let alone on the one-sided record presented by j2.[10]

## IV.   j2's Characterization of the Ruling in the Northern District of Georgia Is Incorrect

Judge Pregerson also considered and rejected the same arguments about the Georgia case made by j2 noting: "The [Georgia] court also emphasized, however, that IGC had failed to allege that Catch Curve's claims arose from or were related to IGC's past services. Here, to the contrary, IGC clearly maintains that j2's claims are connected to these past services. Accordingly, the Northern District of Georgia decision does not resolve the present dispute."

---

[10]   Also, in considering a motion, the Court can only consider admissible evidence; any evidence considered must be properly authenticated by the proponent and proper foundation must be laid. *See, e.g., Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002). Although a minor point, there is nothing in the record to show that j2's counsel is competent to authenticate the submissions made by j2, such as the Agreement of Understanding or the Software License Agreement.

*Pregerson Ruling* at FN 3.  Here, IGC's Complaint contains numerous allegations that, among other things, j2's claims relate to IGC's past services.  ¶¶91-94.  Given that any inferences from these allegations must be drawn in IGC's favor, j2's issue preclusion argument should be rejected.

In fact, j2 acknowledges that IGC's counterclaims did not mention the Agreement of Understanding.  *Motion*, p. 6.  Instead, in that case, filed in 2006, a different company, called Catch Curve, Inc., sued IGC for infringement of a different set of patents, called the AudioFAX Patents.  None of the AudioFAX Patents are included in the Patents-In-Suit.  IGC filed a breach of contract count alleging that Catch Curve breached a provision of the Software License Agreement, a separate agreement, based on Catch Curve's filing of the Georgia case.  IGC also filed a series of antitrust counterclaims, which are ongoing.

In that case, after a series of delays, in July 2010 j2 filed a motion to dismiss IGC's counterclaims but failed to attach an authenticated copy of the Software License Agreement.  IGC pointed this out as one of several arguments made in its response to the motion filed by j2.  Then, in August 2011, the Court, acting *sua sponte*, ordered that IGC stipulate to the authenticity of the Software License Agreement.  In response, IGC complied with the Court's order, but since the Court did not invite further briefing or give IGC an opportunity to be heard, IGC highlighted a few provisions in bullet-point fashion in a two-page cover letter.  *Johnson Dec.*, at Ex. C.  Based on this brief letter, the Court made the statements highlighted by j2 in its order (*"Georgia Order"*).  The Court never stated that its ruling was a dismissal on the merits.  In fact, j2 omits an important part of the Court's ruling where it stated: "IGC's Counterclaim contains no allegation indicating that the instant patent infringement suit "aris[es] from" or is "related to any past services, equipment, software or other assets provided by IGC" to jFax…" *Georgia Order*, p. 27.  As Judge Pregerson noted, IGC has cured this defect in its Complaint.

Regardless of whether time remains to replead, that ruling is also not entitled to preclusive effect because it is not final.  At no point did the court enter a final judgment as to all of the claims pursuant to FED. R. CIV. P. 58, or a partial final judgment as to the breach of

contract claim under FED. R. CIV. P. 54(b).  The finality test for appealability of a federal judgment controls the finality determination for claim preclusion purposes.  *AVX Corp. v. Cabot Corp.*, 424 F.3d 28, 32 (1st Cir. 2005) (citing 18A Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d §4432 & n.3, at 53, §4434 & n.28, at 128 (2002) (collecting cases)).  Here, there was only the announcement of a dismissal, which can only mature into a final judgment when the court resolves IGC's remaining claims.

The Ninth Circuit has cautioned: "[a]ny reasonable doubt as to what was decided by a prior judgment should be resolved against giving it collateral estoppel effect."  *In re Reynoso*, 477 F. 3d 1117, 1123 (9th Cir. 2007) (citation omitted).  Nothing in the Georgia Court's order states that it was entering a final judgment on the merits as to IGC's breach of contract claims, and IGC's antitrust claims remain outstanding.  Since that ruling cannot be appealed until a final judgment is entered on all pending claims, issue preclusion cannot attach.

## V.   j2'S VENUE ARGUMENTS ARE MISPLACED

j2 also requests that venue be transferred back to Judge Pregerson, notwithstanding Judge Pregerson's decision to stay proceedings before him so that the matter could proceed in this Court.  This argument fails at the outset because the proceedings are not related in any way: it does not matter whether IGC infringes the Patent Claims if they are covered by the Release. If IGC prevails in this case and the Court finds that the Patent Claims are within the scope of the Release, there will be no further infringement proceedings before this Court or Judge Pregerson. Judge Pregerson's ruling expressly found that if this Court held the Release covering the Patent Claims, the Central District Action would be dismissed.  *Pregerson Ruling* at 1-2.  Transferring the case back to him would only further magnify the damages suffered by IGC due to j2's breach of the Covenant Not to Sue.  This dispute is also governed by an irrevocable forum selection clause.  As described below, none of the discretionary factors warrant transferring the case back to Judge Pregerson after he has already decided that the matter should proceed in this Court.  This Court should respect that ruling and not simply transfer the case back to him.

Similarly, j2's argument that IGC waived its right to enforce the forum selection clause is misplaced.  It is well settled that courts "indulge every reasonable presumption against waiver." *Fuentes v. Shevin*, 407 U.S. 67, 94 n.31 (1972).  Even if some waiver has occurred with respect to IGC's claims in the Georgia case, which it has not, that case involved different patents and different parties.  Waiver is the "voluntary or intentional relinquishment of a known right." *Jadwin v. County of Kern*, 610 F. Supp. 2d 1129, 1164 (E.D. Cal. 2009) (*citing Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970)).  There is no way IGC could knowingly waive its right to enforce the forum selection clause in a lawsuit filed in 2012 when it filed counterclaims in the Georgia case in 2006.

A contractual forum selection clause is "*prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 10 (1972).  Accordingly, "absent some compelling and countervailing reason," a forum selection clause "should be honored by the parties and enforced by the courts." *Id.* at 12; *see also id.* at 15 ("forum clause should control absent a strong showing that it should be set aside").

The party challenging the forum selection clause bears a "heavy burden of proof" and must "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or over-reaching."  *M/S Bremen*, 407 U.S. at 15; *accord Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988).  None of the discretionary factors cited by j2 carry this heavy burden or support transferring the case back to Judge Pregerson.  j2 cannot be awarded any relief in the Central District action unless it prevails on the merits of this case.  j2 drafted the forum selection clause fixing venue in this Court.  ¶75.  The forum selection clause in the Agreement of Understanding should be enforced.

### CONCLUSION

IGC's Complaint properly states a claim in this matter.  Judge Pregerson reviewed each of the arguments made by j2 but found them unpersuasive.  IGC has properly alleged that its MaxEmail system that was the subject of the Release is the same today as the one for which j2

- 24 -

gave the Release in 2000.  j2 had also filed the patent claims it now asserts that IGC infringes with the USPTO almost two years before it gave IGC the Release.  The fact that only a subset of the filed claims might have been allowed when the Patents-in-Suit issued is irrelevant.  Additionally, the Patent Claims would be captured by the breadth of the general release.  Although j2 asserts that the Release violates public policy, this cannot be the basis of a motion to dismiss because there is nothing in the record to support the claim that IGC is infringing any of the Patents-In-Suit.  Further, the public policy concerns identified by j2 are not applicable in the commercial context, and IGC has properly alleged facts showing that it was the parties' intent to release the Patent Claims.  j2's arguments regarding the Georgia case are misplaced because that order is not yet final and the Court did not indicate that it was ruling on the merits.  Further, IGC has corrected the pleading deficiencies identified by that Court, and that case involves different patents and different parties.  Similarly, j2's arguments that venue should be transferred back to Judge Pregerson notwithstanding his ruling are misplaced because there will be no need to inquire into IGC's purported infringement if it prevails on the scope of the Release, and because this dispute is governed by an irrevocable forum selection clause fixing venue in this district.  Given that all reasonable inferences must be drawn in IGC's favor, the Motion should be denied.

Dated: September 14, 2012

 /s/ Robert Schneider
Robert Schneider
(*Admitted Pro Hac Vice*)
James Heiser
(*Pro Hac Vice Application Pending*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL  60603
Telephone:    (312) 845-3000
Facsimile:     (312) 516-1900
bschneid@chapman.com
heiser@chapman.com

Todd J. Dressel (SBN 220812)
CHAPMAN AND CUTLER LLP
595 Market Street, 26th Floor
San Francisco, CA 94105
Telephone:    (415) 278-9088
Facsimile:     (415) 541-0506
dressel@chapman.com

Attorneys for Integrated Global Concepts, Inc.